GRANDE RONDE LUMBER COMPANY, Appellee, v. DES MOINES CASKET COMPANY, Appellant.

CONTRACTS: Acceptance—Evidence. Evidence in the form of correspondence reviewed, and held insufficient to show an acceptance of a proposed contract.

SALES: Order for Goods—Acceptance—Default—Damages. An order for goods, followed by acceptance, imposes liability for damages in case of default in filling the order. Evidence reviewed, and held to show acceptance of an order and damages in consequence of failure to fill an accepted order.

*Appeal from Polk District Court.*—W. H. McHENRY, Judge.

THURSDAY, JUNE 29, 1916.

ACTION for balance of account, to which defendant pleaded a counterclaim. Judgment was entered for plaintiff, and the counterclaim dismissed. The defendant appeals.—*Reversed.*

*Miller & Wallingford* and *Oliver H. Miller,* for appellant.

*Charles F. Maxwell* and *William E. Cloyes,* for appellee.

LADD, J.—The parties concede an indebtedness of $825.14, owed to plaintiff on the account stated in the petition, and the only controversy is over the counterclaim, which is based on

1. CONTRACTS:
   acceptance:
   evidence.

an alleged breach of contract claimed to have been entered into by correspondence. The sole issue is whether there was a contract; for, if there was, the breach and consequent damages were sufficiently proven. It appears that the plaintiff, which may be designated the lumber company, was engaged in manufacturing coffin boxes, or shooks, at Perry, Oregon, and that the defendant, which may be designated as the casket company, was making and dealing in caskets, shooks, and the like, at Des Moines. Other companies, in some manner connected therewith and engaged in the same business, were located at Sioux City, Kansas City and Wichita. The agent of the lumber company had solicited business from the casket company, which had indicated about what it could make use of, and, on January 30, 1912, the lumber company submitted prices of shooks of different sizes, with numbers corresponding, and proposed "to furnish you your requirements in these shooks for the period of one year from date, based on a minimum of 25 carloads, allowing an option to increase the amount to 40 carloads," and inviting an order for a sample car covering the different sizes mentioned. In February, the casket company responded by suggesting that prices be made for factories at Kansas City, Wichita and Sioux City, as well

as Des Moines, and that certain prices were too high. In response to this letter, the lumber company submitted a schedule of prices for delivery at each of the four localities. The casket company, on March 4th, wrote that it had taken the matter up with the several factories, and that it would like to have the lumber company forward "a regular made out contract giving the option as yours of January 30th on 25 cars with the privilege of 40, with the understanding that this contract is to include any of our houses." To this, the lumber company responded on March 7th by sending "a proposal embodying the conditions of the contract on your coffin shooks for the period of one year," and saying that the proposal was in duplicate, so that the casket company could sign one copy and return to the lumber company, and retain the other copy. The proposal accompanying the letter was that the lumber company would ship 25 carloads of coffin shooks, which the casket company might increase to 40 carloads to the several factories as ordered, said shooks to be made according to attached specifications, and stating the prices at the several places, and adding:

"This proposal shall be considered as an option for you to purchase the quantity of shooks mentioned above for the period of 30 days. In case this proposal is accepted in 30 days, the same shall become a contract, to remain in effect until the first day of March, 1913."

This was signed by the lumber company, and to it was attached the specification. About April 10th, after the lapse of 30 days, the defendant responded by saying that it desired the carload of boxes before closing the contract, adding:

"All of our boxes are made with two cleats on the lid, and your No. 9 box is about an inch shorter than our measurement, and we will expect you to make it this inch longer at this price."

Then follow the details of the order, with a suggestion that the boxes be a "fair sample of what you will furnish us." On April 15th, the lumber company responded by saying that

the order had been entered; that the change in the length of No. 9 would be made, according to suggestion; that the boxes would follow the specifications sent them March 7th; and expressed "the hope that upon receipt of it you will be able to close a contract for the year's requirements." The casket company sent another order for boxes on June 7th, specifying five different sizes, and added: "We also want 50 A-13 and we want them two-piece sides." A shipment was requested within 30 days. On the same day, the casket company wrote explaining the delay, and saying, with reference to the carload of boxes received:

"The grade of lumber is very good, but it is not as dry as your salesman said it would be. He told me it would be kiln dried, whereas we find it quite wet. We have another change to make. The top cleats on the boxes you shipped us are 3¾ in. wide. We would like our cleats made 2¼ in. wide and we want them all made ½ in. shorter than the inside measurements of the box they are made for. We want the little corner cleats made 1½ in. shorter than the box it is meant for is deep. Now, saving on these cleats, we would like to have you make us an allowance for, as it amounts to considerable on the top cleats. We also want to call your attention to another thing; that is, that all boxes must be made with two sides. This is what our contract calls for. Now, Wichita will want two cleats for the box and they will want the edges O. G'd, I think. We will want another car of boxes, and as soon as we get them in and find they are satisfactory and that you are making them as we want them, then we will give you the contract for the 25 to 40 cars. We have signed the contract today and we will hold it until we receive the next car and see that they are all right. Or, in other words, we will hold this contract, changing the cleats and the sides as we have written you above. I note on your last specifications that you say Boxes No. A-13 and A-16 to be three piece sides. This is not according to our agreement or specifications made by your salesman and accepted by you."

To this the lumber company responded, on June 12th, by saying:

"There seems to be more or less of a misunderstanding as to what you require in your coffin boxes, as you mention some point in your letter of June 7th which has never come to our attention before."

It then says that the change in the width of cleats will be made, but without reduction in price, denies that there is any specification indicating that there were to be two-piece sides only, and proceeds:

"It will be out of the question for us to furnish the sides and ends for the 24 and 25 in. boxes other than with three pieces. We do not cut any lumber wider than 12 in. in the grade from which these shooks are to be made, and we could not afford to cut wide stock especially for this business. Now we would like to complete the contract which has been submitted, but we are not in position to do so except on the specifications which we submitted you March 7th, with the following exceptions:

"We will change the specifications for box A-9, your size 5-9 to read 81 in. long by 27 in. by 22 in. inside, and will furnish the 2¼ in. battens instead of the 3½ in. at the same price as we have quoted you for the latter.

"Now if the deal can be closed upon this basis, we shall be glad to take the contract, but at the present time, we are unable to meet your requirements, or make any further reductions in the price. We are not entering your order of June 7th, as we thought better to take the matter up with you as outlined above and have a proper understanding before any complications would arise. We shall appreciate your prompt response, and if satisfactory for us to furnish the boxes, as we have stated above, we shall thank you to wire us your approval, and we will enter your order for prompt attention."

On the back of this letter, the president of the casket company wrote in pencil, "Mr. Root, you had better wire them to make shipment as per your letter of the 12th;" and

a telegram in these words was sent on the 17th: "Ship car as per your letter 12th." On June 16th, the defendant endorsed the following words on plaintiff's proposal of March 7th: "Accepted June 16, 1912.  Des Moines Casket Co., W. H. A."—and mailed it to plaintiff.  On June 17th, the lumber company acknowledged the receipt of the telegram, and, remarking that the order had been entered, said:

"We assume from the telegram that it is now satisfactory for us to furnish the A-13 box with a three-piece side, and to furnish all the boxes with the 2¼ in. square battens.  We have made out the order in this way, and will prepare revised specifications, correcting the lengths of the 5-9 box, including the 2¼ in. batten for all instead of the 3½ in. as originally specified.  This, however, will make no change in the schedule of prices, as we understand that you accept our proposition to change the specifications as above and leave the prices the same, as stated in our letter of the 12th inst., to which you refer.  We trust we have interpreted your wishes correctly, and that the car when received will prove entirely satisfactory."

The completed schedule, as revised, was enclosed.  The carload ordered was shipped August 19th, and on the 24th of that month, the casket company wrote:

"Commence to make for us a car of boxes and we want 200 A-9 and 150 of 10.  Get this so you can ship it to us before the car shortage begins. . . .  We are depending on these boxes, but how in the world are we to get these goods when you take 30 or 60 days to fill an order?"

Three days later, the lumber company indicated its regret over the delay, explained it, and expressed the belief that it would "be able to handle your business perfectly satisfactorily.  We are entering your order for another car as requested, and will get this out as soon as we have completed the order for your Kansas City house.  We are unable to give you the exact date of the shipment of this last car, but

we believe we will be safe in promising that it will go forward in 30 days from this time.''

On September 13th, the lumber company wrote again that they had now brought up . their work, ''and have been cutting the lumber in our factories from which to fill your order. . . . And believe we are safe in assuring you that the shipment will go forward about Thursday of this week.''

But on October 2, 1912, the lumber company wrote the casket company that:

''Owing to the recent strong advances of No. 3 pine boards, we are compelled to withdraw our previous price on coffin boxes. Of course, the. order which we now have on our books for you will be filled and invoiced on the previous price, but on any future business we will be pleased to quote you new prices commensurate with the prices of lumber.''

The casket company advised the lumber company on October 25, 1912, that it would insist upon the fulfillment of the contract, and if this were not done, it would claim damages.

I. This much of the correspondence is essential to the full understanding of the case, and from it, it is apparent that the decision must turn on whether the lumber company's proposal of March 7th, as modified by its letter of June 12th, was accepted by the casket company. The latter contends that its telegram of June 17th, reading, ''Ship car as per your letter 12th,'' constituted an acceptance. These words alone indicate the purchase of but a single carload, and whether, in so ordering, the proposal to sell 25 carloads with the option of increasing to 40 carloads was accepted, necessarily depends on the previous correspondence. It will be recalled that the sample carload had been ordered April 10th, and that, on June 7th, another carload was ordered, but certain changes were specified, especially in the width of cleats and number of side pieces, and there was added:

''We will want another car of boxes, and as soon as we get them in and find they are satisfactory and that you are

making them as we want them, then we will give you the contract of the 25 to 40 cars. We have signed the contract today and we will hold it until we receive the next car and see that they are all right. Or, in other words, we will hold this contract until you make us new specifications of the contract, changing the cleats and sides as we have written you above."

The lumber company's answer undertook to make certain changes, but declined to reduce prices as requested or to make sides of two pieces, and does not refer to the casket company's proposition that it have an opportunity to examine the carload ordered before deciding with reference to making the contract, or that new specifications be prepared. Necessarily, as it could not fill the order exacting two-piece sides, only the order for the carload was held until ascertaining whether three-piece sides would be acceptable. And in saying that, "if satisfactory for us to furnish boxes as we have stated above, we shall thank you to wire us your approval and we will enter your order for prompt attention," manifestly reference was had to the carload ordered June 7th. But that was ordered on the express understanding that the casket company was to examine the shooks to ascertain whether they were satisfactory and made as desired, and thereafter determine whether it would contract for the number of carloads proposed. This condition was never withdrawn, nor was it objected to by the lumber company in its letter of June 12th or at any other time; and, when the casket company telegraphed to ship the car, both parties must have understood that it was to be shipped on the conditions of the order, subject only to the changes in prices and construction involved in the correspondence. Upon analysis of the correspondence, it seems clear that appellant, in giving the order, guarded against the very inference it is now insisting should be drawn, by saying in the accompanying letter that, "as soon as we get them (shooks) in and find them satisfactory and that you are making them as we want them, then we will give you the con-

tract,'' and that the contract would not be made until revised specifications were prepared. That appellee so understood is evidenced by forwarding revised specifications, June 17th. As said, nothing in the lumber company's letter of June 12th suggested a change in the conditions of the order, and the casket company's telegram of June 17th merely directed the shipment of the carload of shooks, made according to specifications as modified by said letter of June 12th, but subject to inspection, and its decision whether a contract would be entered into hinged upon that. There was no acceptance of the proposal as originally made or as modified, and therefore, no contract. That an acceptance of a proposal is essential to constitute a contract is elementary, and no citation of authority is necessary.

II. We do not understand appellant to claim that endorsing an acceptance on the original proposal, when mailed to the lumber company, June 16th, effected an agreement. That it had been changed is not disputed, and such endorsement did not purport to accept the proposal as changed. Moreover, appellant, in its letter of June 7th, had advised the lumber company that revised specifications would be required as a condition precedent, and that it would not decide until after the inspection of the carload of shooks ordered that day,—which was not shipped until August 19th following, and when it reached Des Moines does not appear. In these circumstances, a meeting of the minds is not to be inferred.

III. As previously stated, the casket company ordered as follows:

''We want you to commence to make for us at once a car of boxes, and we want 200 A-9 and 150 of 10. Get this so you can ship it to us before the car shortage commences.''

2. SALES: order for goods: acceptance: default: damages.

The lumber company accepted this order, and in its letter withdrawing its proposal to furnish shooks at prices previously named, this was added: ''Of course, the

order we now have on our books for you will be filled and invoiced on previous prices.'' Here, then, was a specific order for a carload of shooks of sizes specified, on which prices had been quoted, and a complete acceptance, with promise to deliver, followed by an utter failure to perform. The evidence indicated a loss of 83 cents on each shook designated A-9, and on each designated No. 10, one cent more; and 200 of the former and 150 of the latter were ordered. The counterclaim alleged this particular order and its acceptance and breach, and demanded damages generally, and we are of opinion that the issues as to this item should have been submitted to the jury.—*Reversed.*

EVANS, C. J., GAYNOR and SALINGER, JJ., concur.